UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 707 |
| | ) | |
| RODNEY TANNER, | ) | Judge Ronald A. Guzman |
| a/k/a "T-Mac," | ) | |
| KEITH CALVERT, and | ) | |
| FRED CALVERT | ) | |

GOVERNMENT'S SANTIAGO PROFFER

The United States of America, by and through its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and respectfully submits the following Santiago Proffer:

**I. Introduction**

Count One of the indictment in this case alleges that the defendants conspired with each other, to possess with intent to distribute and to distribute in excess of five kilograms of cocaine, in violation of Title 21, United States Code, Section 846. At trial, the government may introduce as evidence certain co-conspirator statements, described more fully below. In this submission, the government describes the law governing coconspirator statements, outlines its evidence establishing the charged scheme and sets forth the general categories of coconspirator statements for which a pre-trial ruling by the Court is requested. The government does not include all of its evidence that would go to show the existence the

conspiracy or all of the coconspirator statements that were made in furtherance of the conspiracy but is highlighting for the Court samples of its evidence in order to establish to the Court the existence of the charged conspiracy and the roles of the various coconspirators in the conspiracy. Thus, this proffer does not list all of the government's witnesses and the evidence they will present.  Nor does the proffer provide all of the evidence that will be presented by those witnesses who are named.

## II. Governing Law

### A.     Admissibility of Coconspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  The admission of a coconspirator statement against a defendant is proper where the government establishes by a preponderance of evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of that particular conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Haynie,* 179 F. 3d 1048, 1050 (7th Cir.1999); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir.1996); *United States v. Santiago*, 582 F.2d 1128, 1130-31(7th Cir. 1978).

Statements may be admitted under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge. *See, e.g., United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991)

(conspiracy charge not a condition for admission of statements under Rule 801(d)(2)(E)). Instead, the statements may be admitted if the government establishes that a criminal venture existed and that the proffered statements were made during and in furtherance of the conspiracy. *See United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990); *see also United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989)

In this circuit, the government often makes its preliminary factual showing as to the admissibility of coconspirator statements by filing a pretrial written proffer of the government's evidence. *See United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992); *see also United States v. Boucher*, 796 F.2d 972, 974 (7th Cir. 1986). The court, in making a preliminary factual determination under Rule 801(d)(2)(E), may consider the hearsay statements sought to be admitted. *See United States v. Brookins*, 52 F.3d 615, 623 (7th Cir. 1995); *see also United States v. Maholias*, 985 F.2d 869, 878 (7th Cir. 1993). Indeed, the court may consider all non-privileged evidence. *See Lindemann*, 85 F.3d at 1238.

A district court's preliminary determination of admissibility for purposes of Rule 801(d)(2)(E) is distinct from the standard required to convict used in determining on appeal whether sufficient evidence exists to uphold a jury verdict in a conspiracy case. The standard to be applied in the context of admissibility under Rule 801(d)(2)(E) is a *preponderance of the evidence* standard. *See Lindemann*, 85 F.3d at 1238, *citing Bourjaily*, 438 U.S. at 175-76.

**1. Membership in and existence of the conspiracy**

A district court may consider the proffered coconspirator statements themselves in

determining the existence of the conspiracy and a defendant's participation in it.  *See Bourjaily,* 483 U.S. at 180; *see United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990).  However, the government must present some evidence, independent of the statements, to corroborate the conspiracy's existence.  *See Lindemann*, 85 F.3d at 1238.  The evidence may be either direct or circumstantial.  The Seventh Circuit has consistently held that "because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence."  *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983); s*ee also Lindemann*, 85 F.3d at 1238 (secretive nature of conspiracies one reason for conspirator exception to hearsay rule).

A defendant joins a conspiracy if he agrees with a conspirator to one or more of the common criminal objectives set forth in the superseding indictment; it is immaterial whether the defendant knows, has met or has agreed with every coconspirator.  *See Boucher*, 796 F.2d at 975; *see also United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); *Rodriguez*, 975 F.2d at 411 (defendant must have intended to join and associate himself with the conspiracy's criminal design and purpose).  The government need not prove, however, that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy.  *See United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *see also United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985).  A defendant may be found to have participated in a conspiracy even if he joined the conspiracy or terminated his

relationship with core conspirators at a different time than another defendant.  *See United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *see also United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.1985).[1]  A district court may consider the conduct, knowledge and statements of the defendant and others in establishing participation in a conspiracy.  Efforts by an alleged coconspirator to conceal a conspiracy may support an inference that he had joined the conspiracy while it was still in operation.  *See United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. 1981); *see also United States v. Freeman*, 498 F.2d 569, 576 (2d Cir. 1974).  Statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern.  *See United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987).  A conspirator who has become inactive in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police.  *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987); s*ee also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).

## 2. Statements made in furtherance of the conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy,

---

[1]  A defendant who did not enter into the agreement essential to any charged conspiracy, may nonetheless be found guilty on the conspiracy count if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy. *See United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *see also United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir.1985); *United States v. Galiffa*, 734 F.2d 306, 309-11 (7th Cir. 1984).  There is no requirement that the indictment charge him with aiding and abetting the conspiracy in order for this principle to apply.  *See Kasvin*, 757 F.2d at 890.

courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals. *See Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987); *see also United States v. Mackey*, 571 F.2d 376, 383 (7th Cir. 1978). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception. *See Shoffner*, 826 F.2d at 628.

Given the government's "relatively low burden of proof on this issue," (*Shoffner*, 826 F.2d at 628), the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *See, e.g., Garlington v. O'Leary*, 879 F.2d 277, 283-84 (7th Cir. 1989). In general, a statement which is "part of the information flow between conspirators intended to help each perform a role" is admissible under Rule 801(d)(2)(E). *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994), quoting *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991). These include statements made: (1) to identify other members of the conspiracy and their roles, *see United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); *United States v. Roldan-Zaoata,* 916 F.2d 795, 803 (2d Cir. 1990); (2) to recruit potential coconspirators, *see Shoffner*, 826 F.2d at 628; (3) to control damage to an ongoing conspiracy, *see United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988); (4) to keep coconspirators advised as to the progress of the conspiracy, *see Potts*, 840 F.2d at 371; (5) to conceal the criminal objectives of the conspiracy, *see United States v. Kaden*, 819 F.2d

6

813, 820 (7th Cir. 1987); (6) to plan or to review a coconspirator's exploits, *see United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a coconspirator can be trusted to perform his role, *see United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986).

### 3.    The absence of confrontation issues

No separate Sixth Amendment confrontation issues are posed at a joint trial by the use of a non-testifying defendant coconspirator's statements which are offered for their truth against another defendant.  This is because "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause." *Bourjaily*, 483 U.S. at 182.  Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met.  *Id*.  As a result, in weighing the admissibility of proffered coconspirator statements, the trial court should not consider whether or not the coconspirator-declarant is "unavailable."  *United States v. Inadi*,  475 U.S. 387, 400 (1986).  A court also need not engage in an independent inquiry into the "reliability" of the proffered statements. *Bourjaily*, 483 U.S. at 183-84.  *Cf. United States v. Pallais*, 921 F.2d 684, 686-88 (7th Cir. 1991) ("cleaner approach" in resolving admissibility under Rule 801(d)(2)(E) would be to examine reliability of proffered statements; but Supreme Court decision in *Bourjaily* forecloses this approach).

As applicable here, this long-standing rule was not affected by the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the prosecution

7

introduced a tape-recorded statement made before trial by the defendant's wife to law enforcement. *Id.* at 38. At trial, however, the wife was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not have an opportunity to cross-examine her. *Id.* at 40. The Court ruled that admission of the statement violated the Confrontation Clause, holding that where the government offers an unavailable declarant's hearsay that is "testimonial" in nature, the Confrontation Clause requires actual confrontation, that is, cross-examination, regardless of how reliable the statement may be. *Id.* at 51-52. As examples of "testimonial" statements, the Court listed prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. *Id.* at 68.

However, the rule in *Crawford* does *not* apply where (1) a statement, though testimonial in nature, is not offered for the truth of the matter asserted, *id.* at 59 n.9; (2) the declarant testifies at trial and is subject to cross-examination regarding the prior statement, *id.* at 59 n.9; (3) the statement is non-testimonial, *id.* at 60; or (4) the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination, *id.* at 59.[2]

In the instant case, the government will offer non-testimonial co-conspirator statements. Under *Crawford*, co-conspirator statements are "by their nature . . . not testimonial." *Id.* at 56; *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005)

---

[2] Another exception to the confrontation requirement applies where the defendant procured the declarant's unavailability, that is, "forfeiture by wrong-doing", *see* 541 U.S. at 62 (citing *Reynolds v. United States*, 98 U.S. 145, 168-169 (1879)); *see also* Fed. R. Evid. 804(b)(6).

("*Crawford* did not change the rules as to the admissibility of co-conspirator statements"). Therefore, because co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and those statements may be admitted without offending the Sixth Amendment.

### B.     Alternative Bases for Admissibility of Statements

Some statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own admissions, for example, are admissible against him pursuant to Fed. R. Evid. 801(d)(2)(A), without reliance on the coconspirator-statement rule.[3]  *See Maholias*, 985 F.2d at 877.  A defendant's own admissions, moreover, are relevant to establishing the factual predicates for the admission of coconspirator statements against him.  *See Potts*, 840 F.2d at 371-72; *see also United States v. Alexander*, 741 F.2d 962, 966 (7th Cir. 1984), *overruled on other grounds*; *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985).[4]

The coconspirator statement analysis also is not triggered when the relevant verbal declaration is not a "statement" within the meaning of Federal Rule of Evidence 801(a).  This

---

[3]  Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

[4]  Other sections of Rule 801(d)(2) provide other alternative bases of admissibility for statements in a conspiracy context.  Rule 801(d)(2)(B), for example, provides for the admissibility of "adopted" statements.  Rules 801(d)(2)(C) and (D) provide, respectively, for the admission of "authorized" statements and statements made by an agent within the context of an existing agency relationship.  *See Feldman*, 825 F.2d at 127.

rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

Further, the coconspirator-statement does not apply when a statement is not being offered for the truth of the matter asserted, as this, once again, is not hearsay.[5] Accordingly, statements by alleged coconspirators may be admitted into evidence without establishing the *Bourjaily* factual predicates, but with corresponding limiting instructions, when such statements are offered simply to show, for example, the existence, illegality, or nature and scope of the charged conspiracy. *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.[6]

## III. Evidence of the Conspiracy

### A.   Origin of Investigation – Information from Confidential Informant

In August 2007, agents with the Bureau of Alcohol, Tobacco and Firearms ("ATF") received information from a confidential informant ("CI") about an individual who had

---

[5] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[6] Of course, in many cases, extended statements by an alleged coconspirator will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes.

approached the CI looking to participate in an armed robbery.  The CI reported that on July 24, 2007, at approximately 3:30 p.m., he was on the 1400 block of Hervey Avenue in North Chicago when an individual known to the CI as "T-Mac," but subsequently identified by the CI as defendant RODNEY TANNER ("TANNER"), flagged the CI down and asked the CI if he knew of "any licks," because TANNER needed to get some money.  The CI explained that he understood the term "licks" to be a street term for an armed robbery or home invasion. The CI told TANNER that he would look into it and then left Hervey Avenue.  According to the CI, at approximately 5:00 p.m., he returned to Hervey Avenue and spoke to TANNER. The CI asked TANNER if he had a gun, to which TANNER responded that he did.  The CI then advised TANNER that he would get back in touch with TANNER at a later date about an up and coming lick.

On August 1, 2007, the CI met with TANNER on the 1400 block of Hervey Avenue. The CI was equipped with an electronic transmitter and recording equipment.  During the meeting, the CI and TANNER spoke again about the "lick" and the CI told TANNER that a lick was in the works.  TANNER then told the CI that he (TANNER) was interested.

On August 10, 2007, the CI made a recorded call, in the presence of law enforcement, to TANNER.  During the conversation, the CI indicated to TANNER that the CI's "guy" would be available later the following week and wanted to meet with TANNER to discuss the upcoming armed robbery.  TANNER acknowledged the information and agreed to wait to hear from the CI.

On September 4, 2007, the CI made another recorded call, in the presence of law enforcement, to TANNER. During the conversation, the CI gave TANNER a cell phone number and told him to call and ask for "Locito" to discuss the armed robbery. TANNER replied that he would call.

B. Contact Between Tanner and the Undercover Agent on September 4, 2007

Later that same day, an undercover ATF agent ("UC"), posing as a drug courier named "Locito," received two voicemail messages from TANNER. In both voicemail messages, TANNER introduced himself as "T-Mac," the CI's brother (meaning friend). In the second voicemail, TANNER instructed the UC to call him back at 847-473-0651.

A short time later, the UC made a recorded phone call to TANNER at 847-473-0651. A female answered the phone and said "Frank's," after which the sounds of a bar could be heard in the background. The UC asked for "T-Mac" and the woman told the UC to hold on. After a few moments, TANNER came to the phone. The UC stated that he was Locito and then stated that he did not want to say too much on the phone but that he was looking for a crew to do some landscaping. The UC further stated that he was going to be traveling out of town for the next two weeks and that upon his return he would contact TANNER to arrange an in person meeting so they could discuss the landscaping job.

C. Contact Between Tanner and the UC on October 4, 2007

On October 2, 2007, the UC made a recorded phone call to TANNER. During this call, the UC and TANNER discussed plans to meet in person on Thursday, October 4, 2007

12

to discuss plans for the armed robbery if TANNER was still interested.  TANNER agreed to meet with the UC and related that he (TANNER) was still interested.

On October 4, 2007, the UC met with TANNER in an undercover vehicle (UCV) in the front parking lot of Frank's Lounge located at Green Bay Road and 22nd Street in North Chicago, Illinois.  This meeting was recorded.  During the meeting, the UC explained to TANNER that the UC was a disgruntled drug courier for a Mexican narcotics distribution organization.  As a result, the UC was looking for an outside crew to conduct an impending armed robbery of approximately 20 kilograms of cocaine from the UC's drug connection.  The UC stated that he usually transports cocaine for the organization once a month and usually near the end of the month.  The UC explained that he will receive a phone call the night before he has to pick up the cocaine letting him know that he will be transporting cocaine the next day and that he never knows the exact location until within the very last hour of his pick up.  In addition, the UC stated that there are usually three un-identified male subject inside the "stash house" and they are usually "cutting up" 20 kilograms of cocaine when the UC arrives.  While the UC waits at the front door, one of the subjects will go into a back room and retrieve the loan of cocaine for the UC to deliver.

The UC then asked TANNER if he had done this type of criminal activity in the past to which TANNER responded: "Hell yeah."  The UC inquired whether TANNER was interested in doing the armed robbery and TANNER answered that he was interested.  TANNER explained that he had three other unidentified subjects in his crew that could help

13

with the armed robbery. TANNER also stated that he had access to two police issued 45 caliber handguns and two Tech-9 handguns. The UC and TANNER made plans to meet the following week so that the UC could meet the rest of TANNER's crew members.

### D. Meeting on October 25, 2007

On October 25, 2007, the UC met with TANNER in an undercover vehicle in the parking lot of Frank's Lounge located at Green Bay and 22nd Street in North Chicago, Illinois. TANNER entered the UCV with KEITH CALVERT and FRED CALVERT, who TANNER introduced as the members of his crew who would assist with the armed robbery. Once TANNER, KEITH CALVERT and FRED CALVERT were all in the UCV, the UC explained the basics of the operation and the reason behind his desire to rob the cartel. The UC explained that he was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection. In addition, the UC stated that he usually sees approximately 20 kilograms of cocaine in the stash house when the UC arrives to pick up his delivery. After hearing this explanation, TANNER, KEITH CALVERT and FRED CALVERT all indicated that they were interested in participating in the home invasion. The UC asked whether they had participated in home invasions in the past and KEITH CALVERT and FRED CALVERT both indicated that they had. The UC stated that if the planned armed robbery was too big a deal for them, they should let the UC know now. KEITH CALVERT and FRED CALVERT both indicated that they wanted to continue with the planned robbery.

14

During this same conversation, the UC further inquired whether TANNER, KEITH CALVERT and FRED CALVERT had firearms to bring with them to the home invasion. KEITH CALVERT responded that they had a .25 caliber semi-automatic handgun nearby. When the UC asked how long it would take them to get the handgun, KEITH CALVERT stated that it was in a van that he and FRED CALVERT had arrived in at the Frank's Lounge parking lot. The UC then explained that he usually sees 2-3 guys in the stash house with handguns and asked what TANNER, KEITH CALVERT and FRED CALVERT would do if they had something bigger. KEITH CALVERT responded that they could get more firearms to use during the home invasion, including a "gauge and an SKS," which the UC understood to mean a shotgun and an SKS assault rifle. The UC then made arrangements for TANNER, KEITH CALVERT and FRED CALVERT to go pick up the additional firearms and then call the UC.

At approximately 4:10 p.m., TANNER, KEITH CALVERT and FRED CALVERT exited the UCV. Surveillance observed TANNER entering Frank's Lounge and KEITH CALVERT and FRED CALVERT entering a silver 2005 KIA mini-van ("van"). After a few minutes, surveillance observed KEITH CALVERT and FRED CALVERT leaving the parking lot in the van. After they left the parking lot, KEITH CALVERT made a phone call to INDIVIDUAL A, who KEITH CALVERT and FRED CALVERT knew to have access to an AK-47 and an SKS assault rifle. KEITH CALVERT spoke to INDIVIDUAL A over the phone, in the presence of FRED CALVERT, and asked INDIVIDUAL A if they could

15

borrow his/her AK-47 and/or SKS assault rifle.  INDIVIDUAL A responded that he did not

have the firearms available on such short notice and did not know anyone else who would.

At approximately 4:23 p.m., surveillance observed the van return to the parking lot

of Frank's Lounge.  TANNER could then be seen exiting Frank's Lounge and entering the

van.  While in the van, TANNER, KEITH CALVERT and FRED CALVERT discussed the

fact that they were unable to obtain an AK-47 or SKS assault rifle to use in the armed

robbery.  Together the defendants agreed to go ahead with the armed robbery using only the

.25 caliber hand gun.  After a few minutes, the UC received a call from TANNER telling the

UC that TANNER and his guys were ready to go.

At approximately 4:45 p.m., TANNER and KEITH CALVERT met with the UC in

the UCV in the parking lot of Frank's Lounge at Green Bay Road and 22nd Street in North

Chicago, Illinois.  During the meeting, the UC asked TANNER and KEITH CALVERT

whether they had the guns, to which KEITH CALVERT responded "Yeah, in the van."  The

UC then instructed TANNER and KEITH CALVERT that they would all be proceeding to

a staging area where they would wait for the call from the UC's drug connection and where

they should leave the UC's share of the kilograms of cocaine after the armed robbery.

TANNER and KEITH CALVERT agreed to accompany the UC in the UCV to this staging

location, but TANNER stated that he wanted FRED CALVERT to wait in the van with the

guns for further instructions from TANNER.  The UC agreed to this plan.

E.  Arrests on October 25, 2007

At approximately 4:55 p.m., surveillance observed the UCV leaving the parking lot at Frank's Lounge with TANNER and KEITH CALVERT inside. Surveillance further observed FRED CALVERT standing outside the van in the parking lot of Frank's Lounge. One group of agents then maintained surveillance of FRED CALVERT and the van, while another group of agents followed the UCV.

At approximately 5:00 p.m., surveillance observed the UCV arrive at the predetermined staging location. Surveillance observed TANNER and KEITH CALVERT exit the UCV with the UC. The UC then gave a predetermined arrest signal and TANNER and KEITH CALVERT were taken into custody without incident.

At approximately the same time, law enforcement conducting surveillance of the parking lot at Frank's Lounge approached the van and took FRED CALVERT into custody without incident. A .25 caliber handgun was recovered from the van. The firearm is a Raven, .25 caliber semi-automatic pistol, Model P-25, Serial Number 062655. This firearm was manufactured outside of Illinois. The firearm was loaded with one round of .25 caliber ammunition and next to the firearm was one magazine loaded with 6 live rounds of .25 caliber ammunition and another magazine loaded with an unknown amount of live rounds that was wrapped in a red bandana.

TANNER, KEITH CALVERT and FRED CALVERT were then placed in the back of a police vehicle for transport to the North Chicago police station. The police vehicle was equipped with video and audio recording equipment. While in the back of the transport

17

vehicle, TANNER, KEITH CALVERT and FRED CALVERT discussed, inter alia, the fact that they were lucky they were not able to obtain additional firearms, that they should not say anything to law enforcement, and that they could not be guilty of a conspiracy to purchase narcotics because they were going to rob the drug dealers and they did not have a significant amount of money on them.

### F.  Post-Arrest Statements from TANNER and KEITH CALVERT

After the defendants were transported to the North Chicago police station, agents met with TANNER individually and read him his *Miranda* rights.  TANNER put his initials next to each of those rights on the written statement of rights form indicating that he understood each right.  TANNER then signed a written waiver of those rights and agreed to be interviewed by the agents.  In a signed, written statement, TANNER admitted that he had met with the UC to plan and participate in an armed robbery of 20 kilograms of cocaine. TANNER stated that he had informed the UC that he (TANNER) had guns that they could use for the "lick."  TANNER reported that he recruited KEITH CALVERT and FRED CALVERT to help with the armed robbery. TANNER further stated that KEITH CALVERT and FRED CALVERT had told him they had guns, but he never saw a weapon.

Agents also met with KEITH CALVERT individually and read him his *Miranda* rights.  KEITH CALVERT put his initials next to each of those rights on the written statement of rights form indicating that he understood each right. KEITH CALVERT signed a written waiver of those rights and agreed to be interviewed by the agents.  In a signed,

written statement, KEITH CALVERT then stated that his cousin, TANNER, had asked him and his brother, FRED CALVERT, to help TANNER get some kilograms of cocaine and that they would get some money for helping out. KEITH CALVERT reported that he and FRED CALVERT made two calls to try to get an AK-47 assault rifle, but no one would bring one. KEITH CALVERT further admitted that he knew the .25 caliber handgun was in the van.

IV.    **Co-Conspirator Statements**

The government intends to introduce statements made by the co-conspirators in furtherance of the conspiracy at trial. This proffer demonstrates the existence of the conspiracy and Rodney Tanner, Keith Calvert and Fred Calvert's membership therein. More specifically, the defendants' recorded statements to the undercover agent, the information provided by the CS, the evidence obtained from the van, Tanner and Keith Calvert's post-arrest statements and the surveillance conducted by ATF agents on October 25, 2007, demonstrate that the defendants worked for a common, openly-discussed purpose – to obtain and distribute kilogram quantities of cocaine.

Further, all of the statements that the government will offer were made during the existence of the conspiracy, namely, on or around October 25, 2007, while defendants were planning and executing the scheme to conduct an armed robbery of kilograms of cocaine, and in furtherance of the conspiracy. Specifically, when defendants were in the KIA van together after seeking more firearms, Keith Calvert explained his failed efforts to obtain an AK-47 or SKS assault rifle. The three defendants then agreed to carry out the armed robbery with

19

the .25 caliber hand gun.  This exchange is a clear example of statements which are "part of the information flow between conspirators intended to help each perform a role." *United States v. Santos*, 20 F. 3d 280, 286 (7th Cir. 1994).  Moreover, Keith Calvert's statements during this exchange constitute statements made to keep coconspirators advised as to the progress of the conspiracy, *see United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987), and to review a coconspirator's exploits, *see United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1987).  In addition, defendants' statements while in the back of the police vehicle – urging each other not to confess and reassuring each other that they cannot be found guilty – are examples of statements made (i) to control damage to an ongoing conspiracy, *Van Daal Wyk*, 840 F.2d at 499; (ii) to conceal the criminal objectives of the conspiracy, *Kaden*, 819 F.2d at 820; or (iii) as assurance that a coconspirator can be trusted to perform his role, *Buishas*, 791 F.2d at 1315.

Although admissible as co-conspirator statements, the government also submits that alternative bases exist for the admission of such statements, including the fact that some of the statements, as discussed above, are merely questions, and hence incapable of verification. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).  Moreover, the law is clear that a tape-recorded excerpt may be played in its entirety, including the statements of non-conspirators, because their statements are not offered for their truth but merely to place the coconspirator statements in context and make them intelligible for the jury. *United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997); *United States v. Davis*, 890

F.2d 1373, 1380 (7th Cir. 1989).

Finally, the statements would also be admissible, non-hearsay to the extent that are introduced, not for the truth of the matter asserted, but to show the existence, illegality, or nature and scope of the charged conspiracy. *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

## V.    Conclusion

This proffer of evidence, which the government expects to introduce in its case-in-chief along with other evidence, demonstrates that the defendants named in the indictment conspired to possess with the intent to distribute and to distribute in excess of 5 kilograms of cocaine. The government respectfully submits that the evidence recited above establishes by a preponderance of the evidence that (1) the charged conspiracy existed; (2) the defendants/declarants were members of the charged conspiracy; and (3) their statements were made during the course of and in furtherance of the conspiracy.

WHEREFORE, the government respectfully moves this Court for a ruling that these

co-conspirator statements are admissible at trial.


Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:    /s/ Edward N. Siskel
       EDWARD N. SISKEL
       Assistant U.S. Attorney
       219 South Dearborn
       5th Floor
       Chicago, Illinois 60604
       (312) 353-5300

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

GOVERNMENT'S SANTIAGO PROFFER

were served on January 24, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

By:     /s/ Edward N. Siskel
        EDWARD N. SISKEL
        Assistant United States Attorney
        219 South Dearborn, 5th Floor
        Chicago, IL 60604
        (312) 353-7602