FILED

MAR 28 2008
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                            )    No. 07 CR 707
        vs.                 )
                            )    Judge Ronald A. Guzman
RODNEY TANNER               )
        (aka T-Mac)         )

## PLEA AGREEMENT

1.      This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant RODNEY TANNER, and his attorney, RONALD CLARK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.      The indictment in this case charges defendant with conspiracy to possess with intent to distribute in excess of five kilograms of cocaine, in violation of Title 21, United States Code, Section 846 (Count One), and using, carrying, and possessing a firearm during and in relation to a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c) (Count Two).

3.      Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant is Pleading Guilty

5.       By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Counts One and Two of the indictment. Count One charges defendant with conspiring with others to possess with intent to distribute in excess of five kilograms of cocaine, in violation of Title 21, United States Code, Section 846. Count Two charges defendant with using, carrying, and possessing a firearm during and in relation to a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c).

## Factual Basis

6.       Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

a.       With respect to Count One of the indictment: Defendant admits that on or about October 25, 2007, at North Chicago, in the Northern District of Illinois, Eastern Division, he conspired with co-defendants Keith Calvert and Fred Calvert, and others knowingly and intentionally to possess with intent to distribute controlled substances, namely, in excess of five kilograms of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of law.

More specifically, on or about July 24, 2007, defendant and a confidential informant ("CI") had a conversation in the 1400 block of Hervey Avenue in North Chicago during which the defendant stated that he needed to make some money and discussed committing

2

an armed robbery. The CI told TANNER that he/she would look into it and then left Hervey Avenue. Later that evening the CI returned to Hervey Avenue and spoke to defendant. The CI asked defendant if he had a gun, to which defendant responded that he did. The CI then advised defendant that he/she would get back in touch with defendant at a later date.

On August 1, 2007, the CI met with defendant on the 1400 block of Hervey Avenue. During the meeting, the CI and defendant spoke again about the "lick," meaning the armed robbery, and the CI told defendant that a lick was in the works. Defendant then told the CI that he (Tanner) was interested. On August 10, 2007, the CI called defendant and told him that the CI's "guy" would be available later the following week and wanted to meet with defendant to discuss the upcoming armed robbery. Defendant acknowledged the information and agreed to wait to hear from the CI.

On September 4, 2007, the CI called defendant, gave him a cell phone number and told him to ask for "Locito" to discuss the armed robbery. Defendant replied that he would call. Later that same day, an undercover ATF agent ("UC1"), posing as a drug courier named "Locito," received two voicemail messages from defendant. In both voicemail messages, defendant introduced himself as "T-Mac," the CI's brother (meaning friend). In the second voicemail, defendant instructed the UC to call him back at 847-473-0651.

A short time later, UC1 called defendant at 847-473-0651. A female answered the phone and said "Frank's," after which the sounds of a bar could be heard in the background. UC1 asked for "T-Mac" and the woman told UC1 to hold on. After a few moments,

3

defendant came to the phone. UC1 stated that he was Locito and then stated that he did not want to say too much on the phone but that he was looking for a crew to do some landscaping. UC1 further stated that he was going to be traveling out of town for the next two weeks and that upon his return he would contact defendant to arrange an in person meeting so they could discuss the landscaping job.

On October 2, 2007, UC1 called defendant and they discussed plans to meet in person on Thursday, October 4, 2007 to talk about the armed robbery if defendant was still interested. Defendant agreed to meet with UC1 and related that he (Tanner) was still interested.

On October 4, 2007, UC1 met with defendant in an undercover vehicle (UCV) in the front parking lot of Frank's Lounge located at Green Bay Road and 22nd Street in North Chicago, Illinois. During the meeting, UC1 explained to defendant that UC1 was a disgruntled drug courier for a Mexican narcotics distribution organization. As a result, UC1 was looking for an outside crew to conduct an impending armed robbery of approximately 20 kilograms of cocaine from the UC's drug connection. UC1 stated that he usually transports cocaine for the organization once a month and usually near the end of the month. UC1 explained that he will receive a phone call the night before he has to pick up the cocaine letting him know that he will be transporting cocaine the next day and that he never knows the exact location until within the very last hour of his pick up. In addition, UC1 stated that there are usually three un-identified male subjects inside the "stash house" and they are

4

usually "cutting up" 20 kilograms of cocaine when UC1 arrives. While UC1 waits at the front door, one of the subjects will go into a back room and retrieve the load of cocaine for UC1 to deliver.

UC1 then asked defendant if he had done this type of criminal activity in the past to which defendant responded: "Hell yeah." UC1 inquired whether defendant was interested in doing the armed robbery and defendant answered that he was interested. Defendant explained that he had three other unidentified subjects in his crew that could help with the armed robbery. Defendant also stated that he had access to two police issued .45 caliber handguns and two Tech-9 handguns. UC1 and defendant then made plans to meet the following week so that UC1 could meet the rest of defendant's crew members.

Defendant and UC1 subsequently made arrangement to meet on or about October 16, 2007, in the parking lot of Frank's Lounge at Green Bay and 22nd Street in North Chicago, Illinois, so that UC1 could be introduced to the members of defendant's crew for the armed robbery. At approximately 3:56 p.m., on October 16, 2007, UC1 and another undercover federal agent (UC2) pulled into the parking lot of Frank's Lounge in an undercover vehicle (UCV). Soon thereafter, defendant exited Frank's Lounge and entered the UCV. Defendant explained that his guy was running late but that he and his guy are "good," meaning that they were ready and able to carry out the armed robbery. UC1 then asked defendant if he and his guys are good with "steel," meaning firearms, to which defendant responded "yes". UC1 explained that if defendant and his guy would have to shoot someone inside the stash house

5

during the armed robbery, he wanted to make sure that defendant's guy could pull the trigger. Defendant explained that UC1 did not have to worry about that.

At approximately 4:29 p.m., an unidentified black male arrived in the Frank's Lounge parking lot. Defendant exited the UCV, met with the unidentified male and then both defendant and the unidentified male entered the UCV. Once inside the vehicle, the unidentified male introduced himself as "D". Shortly thereafter, UC1 explained to Defendant and "D" that UC1 was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection. UC1 then explained the basics of the operation and what he was looking for from the crew that would conduct the home invasion robbery.

After hearing this explanation, "D" stated that he did not want to get himself caught up in anything like that and exited the UCV. Defendant quickly turned toward UC1 and assured UC1 that he (Tanner) was still interested in doing the armed robbery. UC1 asked defendant if he had anyone else in mind to help. Defendant stated that he did and he usually does this type of criminal activity with one other guy and himself making a 2-man crew. Defendant further related that "D" had been in on 5-6 home invasion robberies, but that "D" was usually the driver so may have been "spooked" because he usually does not go inside during a home invasion. Defendant assured UC1 and UC2 that he (Tanner) was 150% in on this impending armed robbery. Defendant further stated that he was about to call one of his other guys because he (Tanner) was not about to pass this impending home invasion up.

6

Defendant further explained that he had approached the CI and told the CI that he (Tanner) needed a "lick". Soon thereafter, defendant asked UC1 to borrow his phone in order to call his other guy. Defendant then placed a phone call to 224-627-8024. After speaking to his guy, defendant explained that the guy who was enroute to meet UC1 and UC2 had recently put defendant onto the last five "licks" that defendant had just done. Defendant further stated that he was tired of "hitting these little petty ass licks," meaning that defendant was tired of robberies involving only marijuana.

At approximately 5:00 p.m., defendant exited the UCV and met with another unidentified black male in the parking lot of Frank's Lounge. Soon thereafter, defendant and the unidentified male entered the UCV and the unidentified male introduced himself to UC1 and UC2 as "T". UC1 then told "T" the basics of the operation and the reason behind his desire to rob the cartel. UC1 explained that he was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection. After hearing this explanation, "T" stated that he was in on the home invasion. "T" further explained that he had just returned home from beating a murder rap and that his money situation was not right either.

UC1 asked "T" if he had any idea as to how he would conduct the home invasion. "T" explained that upon entering the stash house, he might have to hit the UC about his head but would not hurt UC1. "T" further explained that if UC1 was saying that there would be multiple "bricks," meaning kilograms of cocaine, inside the stash house, that he ("T") has

7

to come into the stash house acting like he "gets down" – meaning that "T" may be shooting upon entering the stash house. "T" then related that he knows that this is serious. At approximately 5:07 p.m., "T" exited the UCV and as he exited stated "100," meaning that he was 100% interested in doing the impending home invasion. After "T" exited the UCV, defendant looked at UC1 and stated that he (Tanner) has "nothing but killers on his crew."

On or about October 24, 2007, UC1 called defendant at 224-944-2400. During the call, UC1 stated that he had received the call from his drug connection and that the armed robbery would be going forward the next day (October 25, 2007). Defendant then stated that he would be ready to go the next day. Later that night (October 24, 2007), UC1 received a voicemail message from defendant stating that UC1 should call him at 847-770-7738. UC1 called defendant at that number and defendant stated that "T," the member of his crew who had met with the UC on October 16, 2007, had been "popped off" (meaning arrested) recently and was in custody. Defendant further explained that his "brother" was ready to do the home invasion with him though, and that they would be good to go the next day.

On or about October 25, 2007, defendant approached Keith Calvert and Fred Calvert while they were driving down Hervey Avenue in North Chicago in a KIA mini-van. Defendant entered the vehicle and asked Keith Calvert and Fred Calvert if they were interested in participating with him in a "lick," meaning an armed robbery, of some drug dealers. Defendant explained that the armed robbery was going to be of approximately 20 kilograms of cocaine. Defendant explained that "T" was planning on doing the armed

8

robbery with him, but that "T" had been arrested by local police. Keith Calvert and Fred Calvert agreed to go with defendant to meet his connection to the armed robbery. They proceeded in the KIA van to the parking lot of Frank's Lounge. Once in the parking lot, defendant, Keith Calvert and Fred Calvert entered the UCV and met with UC1 and UC2. During the meeting, UC1 explained the basics of the drug trafficking organization that he worked for and the reason behind his desire to rob the cartel. UC1 explained that he was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection. In addition, UC1 stated that he usually sees approximately 20 kilograms of cocaine in the stash house when the UC arrives to pick up his delivery. After hearing this explanation, defendant, Keith Calvert and Fred Calvert all indicated that they were interested in participating in the home invasion. UC1 asked whether they had participated in home invasions in the past and Keith Calvert and Fred Calvert both indicated that they had. UC1 stated that if the planned armed robbery was too big a deal for them, they should let UC1 know now. Keith Calvert and Fred Calvert both indicated that they wanted to continue with the planned robbery.

During this same conversation, UC1 inquired whether defendant, Keith Calvert and Fred Calvert had firearms to bring with them to the home invasion. Keith Calvert responded that they had a .25 caliber semi-automatic handgun nearby. When UC1 asked how long it would take them to get the handgun, Keith Calvert stated that it was in the KIA van that he and Fred Calvert had arrived in at the Frank's Lounge parking lot. The UC then explained

9

that he usually sees 2-3 guys in the stash house with handguns and asked what defendant, Keith Calvert and Fred Calvert would do if they had something bigger. Keith Calvert responded that they could get more firearms to use during the home invasion, including a "gauge and an SKS," meaning a shotgun and an SKS assault rifle. UC1 then made arrangements for defendant, Keith Calvert and Fred Calvert to go pick up the additional firearms and then call UC1.

Shortly thereafter, defendant, Keith Calvert and Fred Calvert exited the undercover vehicle. Defendant entered Frank's Lounge while Keith Calvert and Fred Calvert entered the KIA mini-van. After a few minutes, Keith Calvert and Fred Calvert left the parking lot in the van to try to obtain an AK-47 and/or SKS assault rifle.

Keith Calvert and Fred Calvert subsequently returned to the parking lot of Frank's Lounge. Defendant exited Frank's Lounge and entered the van. While in the van, defendant, Keith Calvert and Fred Calvert discussed the fact that they were unable to obtain an AK-47 or SKS assault rifle to use in the armed robbery. Together the defendants agreed to go ahead with the armed robbery using only the .25 caliber hand gun. After a few minutes, UC1 received a call from defendant telling UC1 that defendant and his guys were ready to go.

Defendant and Keith Calvert then entered the undercover vehicle and met with UC1 and UC2 in the parking lot of Frank's Lounge. During the meeting, UC1 asked defendant and Keith Calvert whether they had the guns, to which Keith Calvert responded "Yeah, in the van." UC1 then instructed defendant and Keith Calvert that they would all be proceeding

to a staging area where they would wait for the call from UC1's drug connection and where they should leave UC1's share of the kilograms of cocaine after the armed robbery. Defendant and Keith Calvert agreed to accompany UC1 and UC2 to this staging location, but defendant stated that he wanted Fred Calvert to wait in the van with the guns for further instructions from defendant. Defendant and Keith Calvert then left the parking lot with UC1 and UC2 while Fred Calvert waited by the van.

        b.     With respect to Count Two of the indictment: Defendant admits that on or about October 25, 2007, he and co-defendants Keith Calvert and Fred Calvert did knowingly possess a firearm, namely, a Raven, .25 caliber semi-automatic pistol, Model P-25, bearing serial number 062655, in furtherance of, and carried that firearm during and in relation to, a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, a violation of Title 21, United States Code, Section 846, as further set forth in Count One of the Indictment, in violation of law.

        More specifically, on or about October 25, 2007, as part of their plan to participate in an armed robbery of a drug stash house, defendant, Keith Calvert and Fred Calvert decided to bring a Raven, .25 caliber semi-automatic pistol, Model P-25, bearing serial number 062655, with them to assist in committing the robbery. As described above, defendant, Keith Calvert and Fred Calvert discussed with two undercover federal agents the fact that the .25 caliber pistol was in the KIA van that Keith Calvert and Fred Calvert were driving that day and available for their use during the planned armed robbery. In addition,

11

defendant, Keith Calvert and Fred Calvert discussed obtaining additional firearms to use during the planned armed robbery. After Keith Calvert and Fred Calvert were unsuccessful in obtaining the additional firearms, defendant had another discussion with Keith Calvert and Fred Calvert about the fact that they only had the .25 caliber pistol for use during the robbery. During this discussion, defendant, Keith Calvert and Fred Calvert decided to proceed with the armed robbery using only the .25 caliber pistol.

7.     The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8.     Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a.     Count One carries a  maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count One also carries a maximum fine of $4,000,000. Defendant further understands that with respect to Count One the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

12

b.    Count Two carries a maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 5 years. The sentence of imprisonment on Count Two is required to be consecutive to the sentence on Count One. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Two also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Two, the judge also may impose a term of supervised release.

c.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed.

d.    Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is life imprisonment, and the minimum sentence is 15 years' imprisonment. In addition, defendant is subject to a total maximum fine of $4,250,000, a period of supervised release, and special assessments totaling $200.

## Sentencing Guidelines Calculations

9.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.    For purposes of calculating the Sentencing Guidelines, the parties agree and, where noted, disagree on the following points:

13

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

b.    **Offense Level Calculations.**

i.    The base offense level for the charge in Count One of the indictment is 34, pursuant to Guideline §2D1.1(c)(3).

ii.    The parties disagree on whether the defendant qualifies as an organizer, leader, manager or supervisor of the criminal activity. It is the government's position that the base offense level should be increased 2 levels pursuant to Guideline § 3B1.1(c), because defendant was an organizer, leader, manager or supervisor. Defendant disagrees and believes the 2-level enhancement should not apply.

iii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

14

iv.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.  Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

v.    Pursuant to Guideline §2K2.4(b), the Guideline sentence for Count Two of the Indictment is the minimum term of imprisonment required by Title 18, United States Code, Section 924(c), namely 60 months.

c.    **Criminal History Category.**  With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 11 and defendant's criminal history category is V:

i.    On or about August 6, 1996, defendant was convicted of unlawful possession of a firearm by a felon in the Circuit Court of Lake County and sentenced to 4 years' imprisonment.  Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this conviction.

ii.    On or about December 17, 1999, defendant was convicted of possession of a controlled substance, namely in excess of 15 grams of heroin, in the Circuit

Court of Lake County and sentenced to 86 days' imprisonment. Pursuant to Guideline § 4A1.1(b), defendant receives two criminal history points for this conviction.

   iii.  On or about October 30, 2002, defendant was convicted of manufacture/delivery of a controlled substance, namely cocaine, in the Circuit Court of Kenosha County, Wisconsin, and sentenced to 4 years' imprisonment and 5 years' extended supervision. Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this conviction.

   iv.  In addition, because defendant committed the instant offense while on supervision and within two years of release from imprisonment, pursuant to Guideline §§ 4A1.1(d)-(e), defendant receives three more criminal history points.

   d.  **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, and assuming the defendant qualifies as an organizer, leader, manager or supervisor under Guideline § 3B1.1(c), the anticipated offense level for Count One is 33, which, when combined with the anticipated criminal history category of V, results in an anticipated advisory Sentencing Guidelines range of 210 to 262 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. The Guideline sentence for Count Two is 60 months, which yields a combined advisory Sentencing Guideline range of 270 to 322 months' imprisonment. If defendant does not qualify as an organizer, leader, manager or supervisor under Guideline § 3B1.1(c), then the combined advisory Sentencing Guideline range is 228 to 270.

Defendant also acknowledges that he is subject to a statutory minimum sentence of 15 years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Agreements Relating to Sentencing

11.    The government agrees to recommend that sentence be imposed within the applicable guidelines range and to make no further recommendation concerning at what point within the range sentence should be imposed.  Defendant is free to argue for any sentence at or beyond the applicable mandatory minimum sentence provided by statute.

12.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above.  Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.    Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

14.    The government agrees not to file an information against defendant pursuant to Title 21, United States Code, Section 851 seeking enhancement of defendant's sentence on the basis of any prior conviction for a felony drug offense.

## Presentence Investigation Report/Post-Sentence Supervision

15.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of

defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

16.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

17.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient

evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

18.    This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 707.

19.    This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

20.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.      The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately.  The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

21

      v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

      vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.   At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

      b.    **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also

waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

        c.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

21.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

22.    Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

23.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any

of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

24.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

25.     Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 3/28/08

PATRICK J. FITZGERALD
United States Attorney

RODNEY TANNER
Defendant

EDWARD SISKEL
Assistant U.S. Attorney

RONALD CLARK
Attorney for Defendant

24